**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| FAIR HOUSING COUNCIL OF GREATER SAN ANTONIO, <br><br>                 Plaintiff, <br>     v. <br><br> ONE TOWERS PARK LANE COOPERATIVE COMPANY, ARC MANAGEMENT, LLC, ALLYSON SEIPP, and JEFFREY VETTER, <br><br>           Defendants. | Case No. 5:15-cv-1052 |

**COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF**
**AND DEMAND FOR JURY TRIAL**

**NATURE OF THE ACTION**

1.      Plaintiff Fair Housing Council of Greater San Antonio ("FHCOGSA") brings this action against Defendants One Towers Park Lane Cooperative Company, ARC Management, LLC, Allyson Seipp, and Jeffrey Vetter ("Defendants").  Plaintiff seeks a declaratory judgment, permanent injunctive relief, and damages resulting from discrimination on the basis of disability in the provision of housing.  This action arises under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.* and the Texas Fair Housing Act, Tex. Prop. Code Ann. § 301.001, *et seq.*

2.      One Towers Park Lane ("The Towers") is a housing cooperative complex in San Antonio, Texas that has over 350 independent living units for seniors fifty-five years old or older.  As a senior independent living community, The Towers is similar to any retirement community where seniors choose to live together with other residents of a similar age.

Independent living communities are not regulated and are designed for seniors who have chosen to continue living independently.  Generally, other than age minimums, there are no requirements or preconditions for living in these communities, and like any other age-restricted housing unit, people who want to live there cannot be excluded if they meet the age and applicable income requirements.  Independent living communities stand in contrast to assisted living facilities, for example, which are regulated by the state of Texas and have specific licensing requirements depending on the residents' abilities to self-evacuate and on the services provided by the community.  *See* Tex. Admin. Code § 92.1, *et seq.*

3.      Despite long-standing federal and state prohibitions against disability discrimination in the provision of housing and housing-related services, Defendants maintain several policies at The Towers that violate specific provisions of the fair housing laws.

4.      The United States Department of Housing and Urban Development ("HUD") has specifically found that inquiries into prospective residents' possible disabilities violate the Fair Housing Act.  Nonetheless, many housing providers continue to use medical-related admissions questions and criteria to exclude people with disabilities, which to the minds of some housing providers are less-desirable tenants.  Defendants are particularly intrusive in making such inquiries.  Each prospective resident must have a detailed medical assessment performed by a physician and provide the results to Defendants, along with a statement from the physician that the prospective resident meets a certain standard of health.

5.      Defendants also restrict the activities of residents with disabilities.  First, to be able to use a motorized ambulation device at The Towers, residents must register their devices, obtain liability insurance, and provide a physician's authorization for the device.  Second, use of motorized ambulation devices is restricted and, at times, prohibited in the common dining areas.

Third, Defendants prohibit full-time live-in aides for residents who require some assistance with daily tasks.  These practices and policies discourage and prevent people with disabilities from residing in the housing of their choice.

6.     The unlawful practices at The Towers were uncovered through testing by FHCOGSA, which has seen a disturbingly significant amount of discrimination against people with disabilities in senior living communities in the San Antonio area.

7.     On July 31, 2015, after receiving and investigating FHCOGSA's complaint of housing discrimination regarding Defendants' discriminatory policies and practices, the Civil Rights Division of the Texas Workforce Commission, which investigates housing discrimination complaints under the Texas Fair Housing Act, found reasonable cause to conclude that Defendants' policies and practices constitute discrimination in violation of the fair housing law.

8.     Through their actions, which have the purpose and effect of discrimination on the basis of disability, Defendants have violated the federal Fair Housing Act, 42 U.S.C. § 3601, *et seq.* and the Texas Fair Housing Act, Tex. Prop. Code Ann. § 301.001 *et seq.*, and injured FHCOGSA by frustrating its mission and forcing it to divert its resources to investigate and counteract Defendants' discriminatory conduct.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 1367, 28 U.S.C. § 2201, and 42 U.S.C. § 3613(a).

10.     Venue is proper in this District and division pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claims occurred in, the subject property is located in, and the parties reside in this District and Bexar County.

## PARTIES

A.     <u>Plaintiff</u>

11.     Plaintiff Fair Housing Council of Greater San Antonio is a not-for-profit corporation located at 4414 Centerview Drive, Suite 229, San Antonio, TX 78228. FHCOGSA is organized under the laws of the state of Texas with its principal place of business in San Antonio, Texas. FHCOGSA has been, and continues to be, adversely affected by the acts, policies, and practices of Defendants and/or their employees and agents.

B.     <u>Defendants</u>

12.     Defendant One Towers Park Lane Cooperative Company is a not-for-profit corporation that is organized as a co-operative. Its principal place of business is at 1 Towers Park Lane, San Antonio, TX 78209. The Towers is a self-governing co-operative, meaning that resident members own shares in the co-operative. It is operated by a board of directors and several committees, all of which are made up of resident members. Upon information and belief, the board of directors and committees of One Towers Park Lane Cooperative Company establish policies and procedures related to the leasing of units and the requirements and qualifications for prospective and current residents.

13.     Defendant ARC Management, LLC, is the property management company for The Towers. ARC Management, LLC, is authorized to conduct business in the State of Texas and has its principal place of business at 111 Westwood Place, Suite 400, Brentwood, TN 37027. Defendant One Towers Park Lane Cooperative Company contracts with Defendant ARC Management, LLC, to handle administrative details for The Towers. ARC Management, LLC, manages The Towers and has responsibilities related to the leasing of units and establishing and enforcing the requirements and qualifications for prospective and current residents.

4

14. Defendant Allyson Seipp was a Sales Counselor at The Towers. Ms. Seipp maintained responsibilities related to the leasing or purchasing of units at The Towers, including providing prospective residents with forms that seek information regarding their medical conditions and that restrict member activities on that basis. At all times relevant to this complaint, Ms. Seipp was an employee of Defendant ARC Management, LLC.

15. Defendant Jeffrey Vetter is the Executive Director of The Towers and the senior on-site individual who oversees day-to-day management of the property. Mr. Vetter maintains responsibilities related to the enforcement of policies at The Towers and the leasing or purchasing of units at The Towers. At all times relevant to this complaint, Mr. Vetter was an employee of Defendant ARC Management, LLC.

## FACTUAL BACKGROUND

A. <u>Historical Context: Disability Discrimination in Senior Living Communities</u>

16. Housing options have increased in recent decades for persons with disabilities as the demand has grown for more independent living and less institutionalization. This increase is particularly notable in the senior housing industry: whereas seniors used to have the sole choice between a retirement home and a nursing home as they aged, they now have many other options to suit their level of independence, such as senior apartment complexes, assisted living centers, and continuing care retirement communities. *See* Michael Allen, *We Are Where We Live: Seniors, Housing Choice, and the Fair Housing Act*, 31 ABA Civil Rights and Social Justice 15 (2004).

17. With these shifts in the industry, new forms of disability discrimination have arisen. Congress was mindful of this when it passed the Fair Housing Amendments Act in 1988, which expanded the Fair Housing Act to prohibit discrimination on the basis of disability. In

passing the Act, Congress noted that persons with disabilities "have been denied housing because of misperceptions, ignorance, and outright prejudice," and this amendment served to "clearly prohibit[] the use of stereotypes and prejudice to deny critically needed housing to handicapped persons."  H.R. Rep. No. 100-711 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179.

18.     HUD, the agency charged with interpreting and enforcing the Fair Housing Act, has issued regulations stating that, except in limited circumstances, "[i]t shall be unlawful to make an inquiry to determine whether an applicant for a dwelling, a person intending to reside in that dwelling after it is so sold, rented or made available, or any person associated with that person, has a handicap or to make inquiry as to the nature or severity of a handicap of such a person."  24 C.F.R. 100.202(c).

19.     HUD has further described the requirements of the Fair Housing Act regarding inquiries into a prospective resident's disabilities in the context of federally funded housing. HUD has mandated that housing providers must not engage in any inquiry about whether or not a person is "capable of independent living"; rather, the provider should simply "make decisions as to whether each applicant is qualified on a case by case basis in the course of their ordinary eligibility determinations. . . . [, and] [i]n a project that does not provide support services, it is not legally significant whether the obligations of tenancy are met by the individual alone or with assistance which he or she arranges."  HUD, Nondiscrimination Based on Handicap In Federally Assisted Programs, 53 Fed. Reg. 20,216 (proposed June 2, 1988) (to be codified at 24 C.F.R. pt. 8).

20.     Despite the passage of the Fair Housing Amendments Act in 1988, the Texas Fair Housing Act in 1993, and the issuance of HUD regulations, senior housing providers have continued to engage in practices that discriminate against people with disabilities.

6

21.     Many housing providers collect extensive information on medical conditions and make decisions based on individuals' medical conditions.  Housing providers require liability insurance for motorized ambulatory devices and restrict their usage, or steer residents into higher-than-needed levels of care.  These practices have triggered a number of disability discrimination lawsuits, some of which involved qualified seniors being discouraged from pursuing housing opportunities, rejected from housing, transferred to different housing, or evicted because of their disabilities.

22.     The United States Department of Justice has brought several pattern-or-practice cases (in addition to individual cases) against senior communities for illegally discriminating on the basis of disability.  Many of these cases have resulted in consent decrees under which the senior communities agreed to stop the unlawful practices.

23.     In the country generally, and in Texas and the San Antonio area specifically, a significantly greater percentage of seniors have disabilities as compared to younger populations. In San Antonio, 44.2% of seniors 65 years old and older have disabilities compared to just 14.4% of residents under the age of 65.  Similarly, throughout Texas, 39.4% of seniors 65 years old and older have disabilities compared to just 7.2% of residents under the age of 65.  A significantly higher percentage of older San Antonio and Texas residents also have ambulatory disabilities as compared to younger residents.  In San Antonio, 28.1% of seniors 65 years old and older have ambulatory disabilities compared to just 2.6% of residents under the age of 65.  Similarly, throughout Texas, 37.1% of seniors 65 years old and older have ambulatory disabilities compared to just 3.9% of residents under the age of 65.

B.      Complaints Received by FHCOGSA

24.     FHCOGSA has observed a marked increase in the number of disability discrimination complaints filed with its office.  Such complaints make up over 70 percent of its current caseload.  Many of these complaints involve housing providers making unlawful inquiries into individuals' medical conditions or disabilities.

25.     Some of these complaints led to FHCOGSA and the United States bringing a pattern-or-practice case against a San Antonio housing provider.  *See* Consent Order, *Casaregola v. Coop. Ret. Servs. of Am., Inc.*, No. 5:04-cv-0114-OLG (W.D. Tex. Dec. 22, 2004), ECF No. 46 (where senior community had required residents to undergo health examinations and meet certain health requirements to be eligible).  Through the investigation of the *Casaregola* case, FHCOGSA began to learn of the extent of illegal practices, such as unlawful medical inquiries and restrictions on persons with disabilities, being practiced by senior independent living facilities in the San Antonio area.

C.      The Property: The Towers on Park Lane

26.     The Towers is a retirement community located at 1 Towers Park Lane, San Antonio, TX 78209.  It opened in 1988 and is primarily for persons fifty-five years of age or older.  The Towers maintains a policy that 80% of the residents must be fifty-five years of age or older and the remaining 20% must be fifty years of age or older.

27.     Set on thirteen acres, The Towers is a 23-story building with 353 residential units and a 500-car parking garage.  All of the units are for independent living, and they house approximately 440 residents.

28.     Amenities available to all members at The Towers include a community dining area with daily meals, room service, a wellness center, 24-hour surveillance, and an executive-

style club.  Various senior care services, such as rehabilitation, skilled nursing care, and outpatient therapy are available to The Towers residents through Parklane West, which is a separately owned and operated healthcare center.

29.     The Towers is organized as a co-operative, where the majority of units are owned and occupied by resident members, with the exception of units either owned by the co-operative or subleased by members.

30.     As the governing body of the co-operative, the Board of Directors consists of nine resident members who are elected annually.  Resident members can also participate in several committees that assist the Board in managing and operating the property, including the Admissions Committee, which advises the Board on whether applicants should become members and whether to retain current members.  The Board makes all final determinations regarding member status.

D.      FHCOGSA's Investigation

31.     **Request for Fair Housing Training**.  In the fall of 2012, the Executive Director of The Towers, Defendant Jeffrey Vetter, contacted FHCOGSA and requested a meeting with its Executive Director, Ms. Sandra Tamez.  On October 3, 2012, Ms. Tamez met with Mr. Vetter and the then-President of the Board of Directors, who both expressed concerns to Ms. Tamez about the Admissions Committee's actions—specifically, where the Committee had recommended rejecting applications because the prospective residents had disabilities.  They requested that Ms. Tamez conduct a fair housing training for the Board and the Admissions Committee.

32.     Subsequently, Ms. Tamez provided two fair housing training sessions on December 19, 2012, and May 23, 2013, for the Board and the Admissions Committee.  Each of

the trainings focused on disability discrimination.  Specifically, Ms. Tamez provided information

on fair housing prohibitions against inquiring about a person's disabilities and against rules that

create additional restrictions on residents with disabilities.  Defendant Allyson Seipp attended

both of these training sessions.  During these sessions, several attendees expressed to Ms. Tamez

a skepticism about the legal requirements and an unwillingness to change their current practices.

33.     **Testing at The Towers**.  Based on the growing number of disability

discrimination complaints that FHCOGSA had been receiving, FHCOGSA organized a testing

audit of various senior independent living facilities in the San Antonio area.  The Towers was

included in the tests, which were designed to detect whether the independent living facilities

were discriminating in the application process against seniors based on their disabilities.

34.     On December 4, 2013, and December 6, 2013, FHCOGSA sent two testers to The

Towers.  During their visits, the testers recorded the conversations.  Each tester met with Allyson

Seipp and indicated that they were interested in a unit for their parents.  One tester—the

"protected tester"—disclosed that her mother used a motorized scooter.  The other tester—the

"control tester"—gave no indication that either of her parents had a disability.

35.     When she met Ms. Seipp on December 4, 2013, the protected tester mentioned

that her mother used a motorized scooter.  Immediately after the tester made this comment, Ms.

Seipp said, "I guess the one thing that I need to talk about is there is an admissions process, and

that's important.  She will have a medical release from her doctor, stating that she can live

independently and safely . . . . It's just an evaluation, typically a doctor that [she's] seen. . . .

There will be a general application. . . . And then she will have, it's a financial form. . . . Once

she gets all those applications filled out, since we're a co-op, any new residents moving in or

wanting to move in will meet in front of an admissions committee. . . . And then typically once they meet with her, depending on when the board meets, they'll vote on it."

36.     Ms. Seipp then led the protected tester on a tour of the available units and the common areas.  During the tour, Ms. Seipp asked the tester whether her mother used the scooter all the time, or only during certain times.  She also made various comments about residents and their health.  In one conversation, she told the tester about the oldest resident being 102 years old; she noted that the doctors told him he was healthier than some of the younger patients entering The Towers when he got his medical release, although the only thing that "needs a little work" was his hearing.  In another conversation, she stated that a resident can age in place at The Towers "as long as [they're] able to live independently and safely."  Subsequently, when the mother's use of a scooter came up again in conversation, Ms. Seipp said that "there are some residents that will automatically think that a scooter or a walker or a cane is a death sentence."

37.     At the end of the tour, Ms. Seipp provided the protected tester with application materials and explained some of them in more detail.  She pointed out the form authorizing the applicant's physician to release their medical information to The Towers, the letter to the physician explaining the information needed by The Towers, and the medical form to be filled out by the physician.  Ms. Seipp also pointed out the financial form, which she described as "not real detailed" and "not cross verified," and she added that "they don't do a background check or any type of credit report."  She also pointed out the legal forms, which include a list of rules and regulations that all residents must follow.  Specifically, Ms. Seipp mentioned to the tester that "since [your mother] does have a scooter, you know the different rules when you have a scooter, obviously no speeding, don't run over people. . . . You'd be surprised, we have to put rules out there like that."

38.     On December 6, 2013, the control tester met with Ms. Seipp at The Towers.  Near the beginning of the tour of the property, Ms. Seipp gave a broad overview of the application process.  She told the tester that her parents would have to fill out the required paperwork, they would then meet with the admissions committee, and the Board would ultimately vote on their admission.  She made no mention of the medical release or the medical form at this point.

39.     Ms. Seipp then led the control tester on a tour of the available units and the common areas.  When discussing the walking trails on the property at one point, she asked the tester about her parents: "Are they really active?  Do they enjoy doing things? . . . Good."

40.     At the end of the tour, Ms. Seipp provided the control tester with application materials.  She stated that the tester's parents would need to meet with the Admissions Committee in person.  She then explained the forms making up the application, including the general information form, the medical forms, the financial form, and the legal forms.  When discussing the medical forms, Ms. Seipp said, "This is the important—really important—form.  This is the medical release.  So this is an authorization for [] their doctor. . . . This is just allowing him to release their information to us."  In addition to the release form, she pointed out that "[t]his is the medical form. . . . It's yes or no questions. . . . They'll give it to their physician and have him fill it out."  She referred to these forms as "probably the most important, usually the hardest thing to get done."  When discussing the financial form, Ms. Seipp explained that "this is all estimated . . . it's not cross-referenced with anything.  It's not credit checked or background checked.  There's nothing done."  She instructed the tester's parents to "just to the best of their ability and knowledge to fill out some of this information."  She subsequently stated that "in order to have the admissions meeting, we have to have all this paperwork back."  Lastly, when discussing the legal forms, she pointed out the rules and regulations portion and

commented, "It's fun reading. . . . No it is.  There's, you know, general rules that if you have a motorized scooter, don't run people over.  [Laughs]."

41.     Ms. Seipp provided the testers with several documents: a welcome letter on the overall admissions process, an application packet, and a legal packet.

42.     **Welcome Letter**.  This document includes statements from both the Executive Director, Jeffrey Vetter, and the Admissions Committee that provide the applicant with an overview of the admissions process.  First, the Executive Director summarizes the information contained in the application packet: an Application for Residence, a Financial Disclosure Form, an Authorization for Release of Protected Health Information, and a Medical Questionnaire.  He states that all of these forms "must be completed before proceeding with additional admissions proceedings."  Second, the Admissions Committee explains its role at The Towers: it interviews applicants and then issues opinions about applicants to the Board of Directors, which has the final vote on applicants.  The Committee also states that it evaluates applicants based on certain member requirements outlined in the Proprietary Residence Lease: these requirements refer to an individual's "physical, mental and financial ability to be self-sufficient in The Towers." Specifically, the Committee reviews each individual's Application for Residence and Medical Statement (otherwise referred to as the "Medical Questionnaire"), where the Medical Statement "certifies by your physician that you are capable of independent living.  An accurate statement on this aspect is vital . . . ."  In contrast, the Committee does not review the Financial Disclosure Form; only the Director of Financial Services at The Towers reviews this form.

43.     **Application Packet**.  This document outlines the process for applying to The Towers, stating upfront that the goal of the process is "to ensure that every resident is financially eligible and capable of living safely, healthfully, independently and compatibly" at the property.

It explains that "[a]ll applications will be reviewed by the Admissions Committee," and the Board of Directors will then exercise final approval authority over the application.

44.     The Application includes several sections for the applicant to complete.  One section entitled "Authorization for Release of Protected Health Information" states that all applicants are required to undergo a "recent physical examination by [their] personal physician." The section continues: "[A]t the time of admission, each individual must be physically and mentally capable of living healthfully, compatibly and safely" at the property.  Underneath these statements, applicants are prompted to sign a statement authorizing their physician to release "protected health information" in the subsequent medical questionnaire to the Admissions Committee "for the purpose of [their] application for residency."

45.     The next section of the Application is a letter to the applicant's physician along with a medical questionnaire.  The letter states that all applicants must complete a "pre-admission medical assessment" as "an important requirement for residency," and it explains that the property is "designed for active living."  In bold font, the letter states, "Your honest opinions will assist us in determining whether the applicant(s) is/are compatible with residency in this community."  The medical questionnaire then asks several questions to be answered as "yes," "no," or "no personal knowledge" by the applicant's physician.  Some of the questions ask whether or not the applicant is currently living independently; is "mentally able to reason, plan and organize daily events and exercise good judgment in decision making"; and is "capable of living harmoniously within the community" since "disruptive behavioral traits cannot be accommodated."  The bottom of the form prompts the physician to sign and date it if he or she believes the applicant is capable of meeting the above criteria.

46.     The final section of the Application is entitled "Financial Disclosure" and asks the applicant to fill in various information about his or her monthly income, overall assets, and the status of his or her will.

47.     **Legal Packet**.  This document includes the Purchase Contract for common stock in the co-operative, the Proprietary Residence Lease, and the Bylaws of the co-operative, among other items.

48.     In the Purchase Contract of the legal packet, a section entitled "Buyer's Representations" states that the buyer and each member of the buyer's household "are, and will be on the date of Closing, physically and mentally capable of taking care of all aspects of daily living."  The Towers reserves the right to terminate the contract if it becomes aware "of any such change in circumstances."

49.     In the Proprietary Residence Lease of the legal packet, there is a section on Resident and Occupant Standards and also a section on Rules and Regulations.

50.     The Resident and Occupant Standards section states that "[a]t the time of admission, each occupant shall be capable of independent living [which means being physically and mentally capable of taking care of all aspects of daily living] without assistance from another person."  The Board of Directors makes the decision of "[w]hether or not a person is capable of independent living . . . at the time of admission and thereafter . . . ."  The resident is prompted to sign and date an "Acknowledgement of Resident and Occupant Standards," which includes the following statement: "I further acknowledge that whether or not I am capable of independent living is to be determined solely by the Board of Directors of the Co-Op and that if I am not in compliance with the Resident and Occupant Standards, that I must vacate the unit within thirty (30) days following request of the Directors . . . ."

51.     The Rules and Regulations section contains specific provisions on (1) the operation and ownership of motorized carts for residents with ambulatory impairments and (2) the use of live-in aides for residents who cannot live independently.

52.     Residents who want to use a motorized cart at The Towers must meet multiple initial requirements.  They must register the cart with Resident Services prior to using it; receive approval for its use by the Executive Director; obtain liability insurance that includes coverage for all operators of the cart; and obtain a statement by their physician that use of the cart is "essential for reasons of health impairment, and that the applicant has the physical and mental capacity to operate such cart."  Moreover, each year the applicant is required to renew his or her application for use of the cart, which includes an updated physician statement, proof of liability insurance, and an inspection of the cart "at least annually."  The Towers also imposes multiple restrictions on how residents may operate motorized carts throughout the property.  For example, use of carts in the deli and dining room is "discouraged"; able residents will be transferred to a dining chair and their cart removed from the dining area, and residents who are not able to be transferred to a chair "will use tables nearest the entrance."  In addition, use of cart in the buffet lines is "prohibited," and the Executive Director has full authority to suspend or terminate a resident's use of a cart "at any time when, in his judgment, the use is not in compliance with these policies . . . ."

53.     Where assistance with independent living is needed, The Towers prohibits residents from having live-in aides.  While The Towers allows "live-in occupants," which include the resident's spouse, parent, adult children, or adult siblings, it specifically states that privately hired personnel "are not permitted to take up residence in a unit, reside in a unit on a

full-time or permanent basis, or remain in a unit for longer than a 12-hour, non-consecutive work shift . . . ."

54.     Finally, in the Bylaws portion of the legal packet, there is a section detailing the protocol for handling a resident who fails to comply with the Resident and Occupant Standards because of his or her health.  The Bylaws state that if, in the opinion of the Admissions Committee, a resident's health condition deteriorates to the point of no longer complying with the Standards, the resident will be notified in writing and be provided with a hearing. Subsequently, it will be the Board of Directors' "sole and absolute decision" whether the resident is out of compliance.  If found out of compliance, the resident will have thirty days to vacate the property.

E.     Charge of Discrimination by the Texas Workforce Commission

55.     Based on its findings through the tests and other investigation, FHCOGSA filed a complaint with HUD on December 3, 2014, in which it alleged that it was harmed by Defendants' discriminatory conduct.

56.     HUD referred the matter to the Texas Workforce Commission, which investigates fair housing complaints under state law.

57.      On July 31, 2015, after conducting a full investigation into the complaint and finding reasonable cause that discrimination had occurred, the Texas Workforce Commission issued a Charge of Discrimination against Defendants for engaging in discriminatory housing practices on the basis of disability.

58.     The Texas Workforce Commission and FHCOGSA have attempted to conciliate the matter with Defendants in the administrative process but have been unable to reach a conciliation.

59.     On September 18, 2015, based on its finding of reasonable cause, the Texas Workforce Commission-Civil Rights Division, by and through the Texas Attorney General, filed a petition in Bexar County District Court against Defendants under Tex. Prop. Code Ann. §§ 301.131(a) and 301.132.

## INJURY TO PLAINTIFF

60.     As a direct and proximate result of Defendants' discriminatory practices described above, FHCOGSA has suffered and will continue to suffer a diversion of its resources and a frustration of its mission.

61.     FHCOGSA has been damaged by having to divert scarce resources to identify and counter Defendants' discriminatory practices.  FHCOGSA spent staff time and incurred expenses to analyze the testing results from The Towers, conduct outreach to the potentially affected residents, and educate residents regarding their fair housing rights.  Education efforts included creating and mailing postcards to residents, which detailed common illegal practices in senior independent living, summarized relevant fair housing law, and explained FHCOGSA's role in helping to enforce the law.

62.     The staff time and monetary resources diverted toward identifying and counteracting Defendants' discrimination would have been used for a myriad of other projects. For example, office staff had to forgo participating in scheduled outreach events and workshops as a result of their work on this matter.  Moreover, certain staff could not meet their quota of fair housing tests scheduled to take place during that time, and they could not conduct their standard level of outreach or recruitment of testers.

63.     Defendants have caused and continue to cause harm to FHCOGSA by frustrating its mission of eliminating discriminatory housing practices against persons with disabilities in the

San Antonio metropolitan area. Defendants' practice of requesting information and restricting activities related to a prospective renter's disabilities directly impedes FHCOGSA's efforts— both in educating the public on their fair housing rights and also in preventing discriminatory decision-making by housing providers.

64. Despite learning of the clear federal and state fair housing violations from FHCOGSA following its testing audit, Defendants denied any wrongdoing and continued engaging in the discriminatory practices.

65. Defendants have acted intentionally and with willful, reckless disregard for existing federal and state fair housing rights.

## CAUSES OF ACTION

### Count I

### Federal Fair Housing Act, 42 U.S.C. §§ 3604(c), 3604(f)(1), and 3604(f)(2)

66. Plaintiff realleges and incorporates by reference all of the allegations set forth in paragraphs 1 to 65 above.

67. Defendants' acts, including those through its agents, as described above, constitute the making, printing, publishing and/or have the effect of making, printing, or publishing a notice, statement, or advertisement that is about the sale or rental of a dwelling and that indicates preferences, limitations, and/or discrimination or the intention to make preferences, limitations, and/or discrimination because of disability in violation of 42 U.S.C. § 3604(c).

68. Defendants' acts, including those through its agents, as described above, have the purpose and effect of discriminating in the sale or rental of, or otherwise making unavailable or denying, a dwelling because of disability, in violation of 42 U.S.C. § 3604(f)(1).

69.     Defendants' acts, including those through its agents, as described above, have the purpose and effect of discriminating in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, in violation of 42 U.S.C. § 3604(f)(2).

## Count II

## Texas Fair Housing Act, Tex. Prop. Code Ann. §§ 301.022, 301.025(a), and 301.025(b)

70.     Plaintiff realleges and incorporates by reference all of the allegations set forth in paragraphs 1 to 69 above.

71.     Defendants' acts, including those through its agents, as described above, constitute the making, printing, publishing and/or have the effect of making, printing, or publishing a notice, statement, or advertisement that is about the sale or rental of a dwelling and that indicates preferences, limitations, and/or discrimination or the intention to make preferences, limitations, and/or discrimination because of disability, in violation of Tex. Prop. Code Ann. § 301.022.

72.     Defendants' acts, including those through its agents, as described above, have the purpose and effect of discriminating in the sale or rental of, or otherwise making unavailable or denying, a dwelling because of disability, in violation of Tex. Prop. Code Ann. § 301.025(a).

73.     Defendants' acts, including those through its agents, as described above, have the purpose and effect of discriminating in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, in violation of Tex. Prop. Code Ann. § 301.025(b).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

(1)     enter a declaratory judgment finding that the foregoing actions of Defendants violate the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*, and the Texas Fair Housing Act, Tex. Prop. Code Ann. § 301.001, *et seq.*;

(2)     enter a permanent injunction directing Defendants and their agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(3)     award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for its diversion of resources, frustration of mission, and out-of-pocket costs that have been caused by the conduct of Defendants alleged herein;

(5)     award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(6)     award Plaintiff its reasonable attorneys' fees and costs; and

(7)     order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues so triable as of right.

Dated:  December 1, 2015

Respectfully submitted,


/s/ *Javier N. Maldonado*
Javier N. Maldonado
Texas Bar No. 00794216
LAW OFFICE OF JAVIER N. MALDONADO, PC
8918 Tesoro Drive, Suite 575
San Antonio, TX 78217
Tel: 210-277-1603
Fax: 210-587-4001
E-mail: jmaldonado.law@gmail.com

Reed N. Colfax (Motion for admission pending)
Yiyang Wu (Motion for admission to be filed)
Margaret Burgess (Motion for admission to be filed)
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: 202-728-1888
Fax: 202-728-0848
E-mail: rcolfax@relmanlaw.com
        ywu@relmanlaw.com
        mburgess@relmanlaw.com


*Attorneys for Plaintiff Fair Housing Council of Greater San Antonio*